UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK





| | |
|---|---|
| NETYANTRA, INC., NETYANTRA INDIA PRIVATE LIMITED, SANJEEV THOTTAPILLY MENON, and VINOD MENON,<br><br>Plaintiffs,<br><br>v.<br><br>VISTULA COMMUNICATIONS SERVICES, INC., VINOD SANKAR, SHARMILA SANKAR, and ADAM N. BISHOP,<br><br>Defendants. | **COMPLAINT**<br><br>Case No.  08-CV-02414 (GEL)<br>ECF CASE<br><br>JURY TRIAL REQUESTED |

NOW COME PLAINTIFFS NetYantra, Inc. ("NetYantra Delaware"), NetYantra

India Private, Limited ("NetYantra India"), Sanjeev Menon Thottapilly and Vinod Menon,

and allege, as and for their Complaint as follows:

## SUMMARY OF THE ACTION

1.       This is an action by Plaintiffs to protect their legal interests following

NetYantra's sale of technology to Defendant Vistula in April 28, 2006.  Subsequent to the

closing on that transaction, Vistula committed a series of material breaches of the

purchase agreement, and the ancillary agreements to that purchase agreement.

Specifically, Vistula conspired with Mr. Sankar, a former Director of Plaintiff NetYantra,

to divert to Mr. Sankar (i) the payments owed to NetYantra, and (ii) the business

opportunities that the Purchase Agreement assigned to NetYantra.  Further, Mr. and Mrs.

Sankar have wrongfully refused to repay more than $2 million in monies forwarded to

them by NetYantra.  Lastly, Plaintiffs bring this action to require Vistula to honor the

Registration Rights Agreement for the 14,000,000 shares Vistula paid to NetYantra in the

1

purchase.

## PARTIES

2.      Plaintiff NetYantra, Inc. is a corporation registered under the laws of Delaware, with its principal place of business at Suite 102, #327 5200, NW 43rd Street, Gainesville, Florida 32606.  It develops software for products such as Voice over IP ("VoIP") applications that can be used by others for corporate communications.

3.      Plaintiff NetYantra India Private, Limited is a corporation duly registered under the laws of India.

4.      Plaintiff Sanjeev Menon Thottapilly ("Sanjeev Menon") is a resident of India.  He was a founding member of NetYantra, Inc. and NetYantra India, and is a senior executive at both.

5.      Plaintiff Vinod Menon ("Vinod Menon") is a resident of India.  He was a founding member of NetYantra, Inc. and NetYantra India, and is a senior executive at both.

6.      Defendant Vistula Communications Services, Inc. ("Vistula") is a corporation registered under the laws of Delaware, with its principal place of business and corporate headquarters located at 450 Park Avenue, New York, New York 10022.  Vistula is as a supplier of flexible and reliable VoIP services to major Telecommunications Carriers and Internet Service Providers.

7.      Defendant Vinod Sankar ("Mr. Sankar") is a resident of Bombay, India.  He was a Director of Plaintiff NetYantra, Inc. and NetYantra India Private, Limited until his termination from those positions in May 2007.

8.      Defendant Sharmila Sankar ("Mrs. Sankar") is a resident of Bombay, India. She is the wife of Mr. Sankar, and is named herein based upon her receipt and wrongful retention of NetYantra's funds.

9.      Defendant Adam N. Bishop ("Mr. Bishop") resides at 44 Kenilworth Road, London, United Kingdom.  He is the former Officer of defendant Vistula, and President and Chief Executive Officer of its wholly-owned subsidiary, Vistula UK, Inc.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the dispute pursuant to 28 U.S.C. § 1332 as the action is between citizens of different States, and citizens or subjects of a foreign state are additional parties, and the amount in controversy exceeds $75,000.00.

11.     Venue is appropriate under 28 U.S.C. § 1391(a) as defendant Vistula resides in this district.

12.     This Court has personal jurisdiction over defendant Vistula based upon its residence in New York.

13.     This Court has personal jurisdiction over Defendant Mr. Sankar pursuant to CPLR §301 in that he is engaged in a continuous and systematic course of doing business in New York through his travel, business relationships, and regular and systematic dealings with other companies, including his ongoing relationship of providing services to Vistula (which are the subject of this suit).

14.     This Court has personal jurisdiction over Mr. Bishop in that he has entered into a contract with NetYantra and received monies from Vistula's New York accounts.

15.     This Court also has personal jurisdiction over Mr. Sankar pursuant to CPLR § 302(a) (1) and (2), in that he has committed tortious actions (described herein) in

New York, and actions outside of New York that have caused damages within New York. Specifically, Mr. Sankar has:

- interfered in the existing contractual relationship between NetYantra and Vistula (in New York);

- transacted business with Vistula (in New York), receiving monies – along with his wife – from Vistula's New York accounts;

- converted funds owed NetYantra payable by Vistula (in New York); and

- wired monies from the Purchase Agreement to and from New York accounts.

16.    This Court also has personal jurisdiction over Mrs. Sankar pursuant to CPLR § 302(a) (1) and (2), in that she committed tortious actions (described herein) in New York, and actions outside of New York that have caused damages within New York. Specifically, Mrs. Sankar transacted business in New York, receiving and converting monies wired from Bank of the New York New York accounts intended for NetYantra.

17.    This Court has personal jurisdiction over Mr. Bishop pursuant to CPLR § 302(a)(2) in that he has transacted business in New York and the claim against him arises out of that transaction.  The Court also has general jurisdiction over Mr. Bishop, in that he regularly transacts business in New York.

## NETYANTRA'S DEVELOPMENT OF THE V-CUBE

18.    Plaintiff NetYantra is a leading developer of software and communications technology.  One of its significant software developments is called "the V-Cube."  The V-Cube solution is a VoIP technology that facilitates full contact communication services including Voice, Video, Conferencing, Call/Contact Center and full hosted IP/PBX functionality across IP networks and provides a centralized administration, provisioning

and maintenance interface.  V-Cube offers cost effective IP Communication to Telephone

Companies and Internet Service Providers to launch products to their customers.

19.    In 2004, NetYantra entered into a Distribution Agreement with Vistula,

which desired to use the V-Cube as part of its VoIP platform.  Through a license,

NetYantra provided Vistula with the ability to incorporate the V-Cube technology and

market it to United States Telecoms and ISP providers.

## THE APRIL 2006 PURCHASE AGREEMENT

20.    As the relationship developed, Vistula approached NetYantra about

acquiring the V-Cube technology.  Following discussions, on April 28, 2006, Vistula and

NetYantra entered into a Purchase and Sale agreement by which Vistula acquired

NetYantra's V-Cube IP-PBX solution and related intellectual property rights from

NetYantra for an aggregate purchase price of $8.8 million in cash and 14,000,000 shares

of Vistula.

21.    An addition to the Purchase Agreement, Vistula and NetYantra entered into

a Registration Rights Agreement for the 14,000,000 shares.

22.    A further integral component of the transaction was Vistula's commitment

to enter into three ancillary agreements:

- a "License and Revenue Agreement" by which Vistula and NetYantra would
  allocate revenues from licensing work; and NetYantra could continue selling the
  product in India and earn revenues separate from Vistula;

- a Services Agreement relating to the provisions of engineering services by Sellers
  to Buyer for the technical support and development of Sellers Technology
  following Closing; and

- an "Executive Employment Agreement" for NetYantra's senior executives, including Sanjeev Menon and Vinod Menon.

23.    Originally, these three agreements were to be executed prior to closing. However, given the significant closing activities – and the additional factor of Vistula's concurrent financing transaction with a third party – Vistula's requested an extension of time in which to finalize those agreements.  On June 7, 2006, the parties entered into a Second Amendment of the Agreement by which they deferred the Purchase Agreement's obligation to complete these three ancillary agreements from prior to closing, to requiring completion within 60 days of the closing.

24.    Specifically, the Second Amendment to the Purchase Agreement provided in Section 6.9:

> License and Revenue Agreement.  Sellers and Buyer shall use commercially reasonable efforts to negotiate and execute within sixty (60) days following the Closing a license and revenue agreement (the "License and Revenue Agreement") relating to (i) the licensing of the Sellers Technology to the Sellers for the limited purposes set forth in such agreement and (ii) the revenues relating to such licensed activities.  Without limiting the foregoing, the parties agree that the License and Revenue Agreement shall also provide that:
>
> (a) in the event that Buyer ceases operations, subject to applicable law, Buyer shall grant Sellers a non-exclusive, royalty-free license to: (i) market and distribute the Seller Technology to customers solely in those countries in which Buyer shall not have then granted exclusive license or distribution rights to any party with respect to any part of the Seller Technology; and (ii) to use and modify the source code of the Seller Technology solely to the extent required to adequately support and maintain customers to whom the Seller Technology has been sublicensed by NetYantra in accordance with the terms of the License and Revenue Agreement; and
>
> (b) during the term of the License and Revenue Agreement, NetYantra shall be entitled to use and modify the source code of the Seller Technology in order to support and maintain NetYantra's

customers under sublicense agreements which are permitted by the terms of the License and Revenue Agreement; provided, however, that (i) NetYantra obtains the prior written consent of Vistula to such modifications (such consent not to be unreasonably withheld); (ii) all rights, title and interest in such modifications shall be owned by Vistula; and (iii) such modifications shall not be made to Vistula's source code base for the Seller Technology except with the prior written consent of Vistula."

    25.    Section 6.10 was added to require the negotiation and execution of a Services Agreement.

Services Agreement. Sellers and Buyer shall use commercially reasonable efforts to negotiate and execute within sixty (60) days following the Closing a services agreement relating to the provisions of engineering services by Sellers to Buyer for the technical support and development of Sellers Technology following Closing (the "Services Agreement"). The Services Agreement shall provide, among other things, that (i) the Sellers shall provide the full time services of at least 22 employees to perform and provide the support and development services to be described in the Services Agreement; (ii) the monthly fee payable by Buyer to Sellers for the services to be provided under the Services Agreement (the "Monthly Fee") shall not exceed $63,360 (unless additional NetYantra employees are required to perform the services under the Services Agreement in which case such maximum monthly amount shall be increased by $2,880 per additional agreed employee); (iii) the Monthly Fee shall be payable monthly in advance; and (iv) the first payment of the Monthly Fee shall occur upon execution of the Services Agreement by NetYantra and Vistula and shall include those Monthly Fees that would have otherwise been payable had the Services Agreement been executed by the parties on the Closing Date.

    26.    Section 6.11 of the Second Amendment also required the parties to prepare an Employment Agreement for Messrs. Vinod Menon and Sanjeev Menon:

Executive Employee Agreements. Sellers and Buyer shall use commercially reasonable efforts to negotiate and execute within sixty (60) days following the Closing an executive employment agreement (an "Executive Employment Agreement")."

27.    The Agreement also contained a non-solicitation provision, section 6.8, which provided:

> Non-Solicitation. During the term of the Services Agreement and for a period of twelve months following the termination or expiration of the Services Agreement, neither NetYantra nor Vistula will, directly or indirectly, solicit for hire, or assist any third party to solicit or hire, any individual person who is or shall have been an employee, subcontractor, agent of, or consultant to, Vistula (with respect to NetYantra) or NetYantra (with respect to Vistula) during the 12 month period prior to the hiring by such party (the 'Cooling Off Period'), without the consent of Vistula (with respect to NetYantra) or NetYantra Delaware (with respect to Vistula).

28.    On June 7, 2006, Vistula completed the acquisition of certain assets of NetYantra.  In accordance with the terms of the First Amendment to the Purchase Agreement, 14,000,000 shares of the Share Consideration were to be issued to NetYantra Delaware at the closing.  Because Vistula had pledged certain shares to the third-party in the May 2006 financing, it was unable to deliver to NetYantra the full 14,000,000 shares.  Although promised to NetYantra, none of the 14,000,000 shares has yet been delivered.

### VISTULA'S BREACH OF ITS OBLIGATIONS
### TO NEGOTIATE ADDITIONAL AGREEMENTS

29.    Initially, Vistula did use commercially reasonable efforts towards completing the negotiations of the Services Agreement and the Employment Agreement for Sanjeev Menon and Vinod Menon.  Through that process, Vistula and NetYantra substantially completed the Services Agreement and the Employment Agreement.

30.    Notwithstanding that agreement on all material terms, Vistula thereafter breached its obligation to use commercially reasonable efforts to execute the documents.  Specifically, it engaged in unwarranted delay in finalizing the agreements, without raising any substantive objections to the agreements' substance.

31.    Acting in reliance on Vistula's assurances that it was acting in good faith, on August 3, 2006, NetYantra agreed to Vistula's request to extend the 60-day negotiation period for a further 30-days.

32.    The subsequent months brought additional delay on the part of Vistula.  On November 14, 2006, NetYantra raised objections to Vistula's continuing default of its obligation to negotiate the remaining agreements.

> As you are aware NetYantra had already agreed to extend the signing of the remaining agreements (Service Agreement, Executive Employment Agreement and Distribution Agreement) twice as requested by Vistula.  NetYantra has repeatedly requested Vistula to expedite these matters and have co-operated to our full ability to finalize these agreements.  However, we have seen very little effort or interest from Vistula to move forward in any meaningful manner. We had therefore requested that Vistula should at least formally state its inability to finalize matters in the near future, acknowledge its responsibilities, and rights granted to NetYantra, under these agreements and as described in the Asset Purchase agreement and also acknowledge that NetYantra is not to be held responsible in any manner for the delay in concluding these matters.

33.    In response to this notice, on November 20, 2006 Vistula completed the negotiations of the Services Agreement.  That draft contained the essential elements of the Services Agreement.   Vistula reported to Plaintiff that its C.E.O., Mr. Rupert Galliers-Pratt had approved the terms of the agreement, subject only to a veto by Vistula's counsel.

> it is our intention to give the attached to [our counsel] with the instruction that this is approved subject only to any strong advice they give us to the contrary.

34.    NetYantra was never informed of any objections from Vistula's counsel, or asked to modify any of its provisions.

35.    Nonetheless, Vistula has refused to sign the agreed upon Services Agreement, or to continue negotiation the Services Agreement. Such unjustified refusal to proceed is a breach of the Purchase Agreement.

36.    Vistula also took affirmative steps towards employing Vinod and Sanjeev Menon and provided Sanjeev Menon with business cards, and used them to assist the company.

## VISTULA'S BREACH OF THE DISTRIBUTION AGREEMENT/PURCHASE AGREEMENT

37.    While the parties negotiated the Services Agreement contemplated by the Purchase Agreement, NetYantra and Vistula continued to provide support services according to the terms of the existing Distribution Agreement. Specifically, the Second Amendment of the Purchase Agreement extended the term of the services NetYantra would provide until the parties executed a final Services Agreement:

> Until the Services Agreement is executed, the Sellers shall provide support of the Sellers Technology in the manner described in Sections 4.5 and 5.5 and Exhibit F of the Distribution Agreement dated as of August 14, 2004 currently in effect in writing between the parties and in such other manner as may be agreed between the parties, notwithstanding that such Distribution Agreement shall be terminated upon the Closing.

38.    From June 2006 until March 2007, NetYantra complied fully with its contractual obligations under the Distribution Agreement and the Purchase Agreement.

39.    Notwithstanding NetYantra's faithful performance of its duties, Vistula did not comply with its obligations, and was in immediate default. In late 2006, Vistula stopped paying NetYantra for the services it provided and duly billed to Vistula. Such a failure was a material breach of the Distribution Agreement, as applicable by the Second Amendment to the Purchase Agreement.

40.    On numerous occasions during the period of breach, NetYantra pressed Vistula for payment.  In response, Vistula advised NetYantra that it was experiencing money shortages, and provided assurances that it would pay the total amounts due NetYantra upon obtaining financing.  That financing, Vistula wrote to NetYantra, would "enabl[e] Vistula to finance NetYantra's technical support work for V-Cube."

41.    Vistula did complete the financing in April 2007.  However, Vistula still failed to cure its material default.  On May 10, 2007, NetYantra submitted a demand for payment for the services provided from December 2006 until March 2007.

| Period | Employees | Hours | Bill |
|---|---|---|---|
| December 06 | 29 | 4816 | 86,688.00 |
| January 07 | 28 | 5008 | 90,144.00 |
| February 07 | 28 | 4424 | 79,632.00 |
| March 07 | 27 | 4632 | 83,376.00 |
|  |  | 18880 | 339,840.00 |

42.    Vistula has acknowledged the work performed by NetYantra in its public filings with the United States Securities and Exchange Commission, and has never disputed the invoice.

43.    Vistula has failed to pay NetYantra for the work performed from December to March.  Those amounts remain due and owing NetYantra.

**MR. SANKAR'S WRONGFUL CONDUCT (i) CONVERTING THE NETYANTRA PAYMENTS, (ii) INDUCING VISTULA TO BREACH THE DISTRIBUTION AGREEMENT, AND (iii) USURPING THE VISTULA WORK**

44.    Mr. Sankar was a Director of NetYantra and NetYantra India during the relevant period, until he was terminated in May 2007 for the wrongful acts described herein.  In those positions, he owed fiduciary duties to the two corporations.  Among the

fiduciary duties are the duties of undivided loyalty, including the duty not to usurp corporate opportunities.

45.     Mr. Sankar breached those duties in several material respects starting in or about late 2006 or early 2007.

### The Sankars' Failure To Repay NetYantra

46.     During the distribution to NetYantra of the $8.8 million owed in the sale, NetYantra and Mr. Sankar agreed that $6 million of the consideration would be wired to NetYantra using two intermediary accounts.  Accordingly, while $2.8 million was wired directly to NetYantra, $3 million was wired to the intermediary accounts held by Mr. Sankar and Mr. Menon.  Both of the intermediaries agreed to wire these funds to NetYantra's corporate account.

47.     At the time of closing, Mr. and Mrs. Sankar requested a further advance of $1,815,000.000 from NetYantra in order to purchase real property in India.

48.     NetYantra agreed to advance the $1,815,000.00 to the Sankars, on the condition that this loan would be offset from any distribution NetYantra would make to Mr. Sankar.

49.     NetYantra wired the $1,815,000 loan into the Sankar accounts, in the following amounts:

| | | |
|---|---|---|
| Oct. 10, 2006 | $160,000 | Wired to Sharmila Sankar |
| Dec. 14, 2006 | $185,000 | Wired to Rafisons |
| Feb. 16, 2006 | $170,000 | Wired to Rafisons |
| Feb. 21, 2006 | $195,000 | Wired to Rafisons |
| Feb. 28, 2007 | $145,000 | Wired to Rafisons |
| March 7, 2007 | $180,000 | Wired to Rafisons |
| March 12, 2007 | $195,000 | Wired to Rafisons |
| March 15, 2007 | $195,000 | Wired to Rafisons |
| March 27, 2007 | $390,000 | Wired to Sharmila Sankar |
| | $1,815,000.00 | |

50.     Mr. Sankar and his family/affiliates have returned only $2,160,000.00, in the following sums:

| | |
|---|---|
| February 1, 2007 | $500,000 |
| February 26, 2007 | $500,000 |
| March 27, 2007 | $1,160,000 |

51.     In total, NetYantra wired $4,815,000.00 to the Sankars.

52.     The Sankars have repaid NetYantra only $2,160,000.00 of this amount.

53.     Accordingly, Mr. and Mrs. Sankar are obligated to transfer to NetYantra the balance ($2,655,000.00) wrongfully held by them.

### Wrongful Usurpation Of Corporate Opportunities And Monies

54.     Following the closing, Mr. Sankar commenced a plan to create an entity that would compete against NetYantra.  In furtherance of that plan, Mr. Sankar – while still a Director at NetYantra – surreptitiously formed a competing entity, stole proprietary data, conspired with Vistula to convert funds owed to NetYantra, and commenced competing against NetYantra.

55.     Vistula, too, is liable for this breach, because it has a separate contractual obligation not to do business with Mr. Sankar.  The decision to breach its obligations to NetYantra and enter a relationship with Defendant Sankar was expressly prohibited by the Purchase Agreement, which contained a non-solicitation provision.  Vistula itself acknowledged that restriction in its own SEC filing:

> the terms of the Purchase Agreement prohibit, during the term of the services agreement and for 12 months thereafter, the Company and NetYantra from soliciting for hire, directly or indirectly, an employee, subcontractor or consultant of the other party, without that other party's written consent.

56.     Mr. Sankar induced seven employees of NetYantra to leave the company to assist his individual work for Vistula.

57.    In addition to breaching the non-solicitation provision, Vistula's conduct also aided and abetted Mr. Sankar's breach of the fiduciary duties owed to NetYantra.

58.    Vistula has acknowledged these breaches in its filings with the S.E.C.   In its Supplement to its Prospectus, Filed pursuant to Rule 424(b)(3), Vistula admitted Mr. Sankar's (i) misstatements about NetYantra's condition, and (ii) his usurpation of NetYantra's contract to service the V-Cube.   It also acknowledges that it failed to pay NetYantra for the services it had provided:

> Although a mutually satisfactory services agreement has not yet been executed, NetYantra had been performing services for the Company since June 7, 2006.  …As of March 31, 2007 $280,000 was accrued for services provided for December 2006 through March 31, 2007 and for services provided to the Company by one of the authors of the V-Cube who was also a principal of NetYantra, all of which **was paid on April 25, 2007 to the author and principal who provided services as the Company was informed NetYantra's operations had been closed**. The Company continues to receive services provided by the principal and consultants under terms separately from NetYantra. (Emphasis added)

59.    NetYantra has not received any of the monies owed it, as Vistula has failed to pay to NetYantra the monies owed to NetYantra for services rendered.

60.    By Vistula's admissions, it now has engaged Mr. Sankar to perform the services it was obligated to obtain from NetYantra.

61.    By Vistula's statements, Mr. Sankar has made fraudulent statements to Vistula about NetYantra's status, in order to obtain those funds and future work.

62.    The statements about NetYantra's purported dissolution, which Vistula cites in its S.E.C. filings, were verifiable and clearly false.  Accordingly, any reliance by Vistula upon those false statements would be unreasonable, and would not justify its departure from the method of paying NetYantra previously utilized.

## VISTULA'S BREACH OF THE REGISTRATION RIGHTS AGREEMENT

63.     An exhibit to the Purchase Agreement was a Registration Rights Agreement, which provided NetYantra with certain rights with respect to the 14,000,000 shares acquired in the Purchase Agreement.

64.     Specifically, Section 2.2 of the Registration Rights Agreement provided:

> If [Vistula] proposes to register any of its stock or other securities under the Securities Act in connection with the public offering of such securities solely for cash (other than an Excluded Registration), the Company shall, at such time, promptly give NetYantra notice of such registration.  Upon the request of NetYantra given within twenty (20) days after such notice is given by the Company, the Company shall, subject to the provisions of Section 2.3, cause to be registered all of the Registrable Securities that NetYantra has requested to be included in such registration.

65.     On April 6, 2007, Vistula entered into a placement of 8,000,000 shares of its common stock, and 4,680,000 warrants.  On May 7, 2007, it filed a form SB-2 registration statement with the S.E.C. to register the 12,680,000 shares, along with an additional 2,500,000 shares that had been issued in connection with an October 11, 2006 acquisition.   The registration statement for those shares became effective on May 14, 2007.

66.     Those shares were registered for sale to the public.  As referenced in the S.E.C. registration statement, the offering had an "approximate date of proposed sale to the public: As soon as practicable after this Registration Statement becomes effective."

67.     At the time that Vistula should have registered NetYantra's 14,000,000 shares, the shares were trading publicly on NASD at or about 7¢ a share.  Subsequent to the failure to register the shares, the price of the Vistula shares has dropped.

68.     Vistula's failure to comply with the Registration Agreement has damaged NetYantra in an amount to be established at trial.

### COUNT ONE (Against Vistula)
### (Breach of Distribution Agreement)

69.     Plaintiffs repeat and reallege the facts contained in paragraphs 1 through 68 of the complaint, as if set forth fully herein.

70.     Vistula has committed a material breach the Distribution Agreement by failing to pay NetYantra the amounts it owed, in excess of $339,000 for past services provided to Vistula.  Vistula also is in material breach of the ongoing obligations of the Distribution Agreement, which was to have remained in place (except when prematurely terminated by Vistula's breach) until the parties executed the Services Agreement.

71.     Accordingly, NetYantra has been damaged in the amount of past services provided, and the lost value of the future services it would have provided to Vistula in the interim period until a Services Agreement was finalized, and for the subsequent two year term of the Services Agreement.

### COUNT TWO (Against Vistula)
### (Breach of Distribution Agreement: Account Stated)

72.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 71 of the complaint, as if set forth fully herein.

73.     NetYantra has provided services to Vistula for design and customer support work.  In accordance with the Distribution Agreement between the parties, Vistula has maintained an account with NetYantra, and NetYantra has provided Vistula with invoices showing the amounts owed on the account.

74.    Vistula has not protested the amount of the invoices, and instead has simply asked for additional time to make payment.

75.    NetYantra is owed the amount stated in the account, in the amount of $339,840.00.

### COUNT THREE (Against Vistula)
### (Breach of Asset Purchase Agreement)

76.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 75 of the complaint, as if set forth fully herein.

77.    Vistula breached the Asset Purchase Agreement in several distinct manners.

78.    First, Vistula breached the Purchase Agreement by employing Mr. Sankar to perform the very same services for which it had engaged NetYantra.  Amendment No. 2 provides that during the term of the services agreement and for 12 months thereafter Vistula would not solicit for hire, directly or indirectly, an employee, subcontractor or consultant of the other party, without that other party's written consent.

79.    Second, Vistula breached by failing to negotiate the three agreements in commercially reasonable manner.  The Purchase Agreement required Vistula and NetYantra to use commercially reasonable efforts to negotiate and execute within sixty (60) days following the closing of the asset purchase transaction a license and revenue agreement, a services agreement and an executive employment agreement.  Instead, in bad faith, Vistula delayed the execution of the documents, even through those were fully negotiated.  Such actions were not "commercially reasonable" and breached the provisions of the Purchase Agreement.

80.     Because of the failure to negotiate the License and Revenue agreement, NetYantra lost revenues of approximately $400,000 per year that it had been earning from sales in India.

81.     NetYantra has been damaged as a result of Vistula's breach, in an amount to be established at trial.

## COUNT FOUR (Against Vistula)
### (Breach of Employment Agreement)

82.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 81 of the complaint, as if set forth fully herein.

83.     Defendant Vistula employed Sanjeev Menon and Vinod Menon for the period June 2006 pursuant to an oral employment agreement.  Vistula vested Sanjeev Menon with the supplies required for his duties, including providing him with business cards showing him to be a Senior Vice President.  During this period, Sanjeev Menon and Vinod Menon performed services on behalf of Vistula.

84.     Sanjeev Menon and Vinod Menon have been injured by Vistula's failure to employ them, or compensate them for the services provided.

## COUNT FIVE (against Mr. Sankar)
### (Breach of Fiduciary Duty)

85.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 84 of the complaint, as if set forth fully herein.

86.     Mr. Sankar owed fiduciary duties to NetYantra.  Included among those duties was the duty not to usurp business opportunities.

87.     By misappropriating the servicing of Vistula's support needs, Defendant Sankar has breached those fiduciary duties.

88.    NetYantra has been injured by Mr. Sankar's breach of fiduciary duty, in an amount to be established at trial.

89.    NetYantra also seeks disgorgement of undue profits.

## COUNT SIX (against Vistula)
### (Aiding And Abetting Breach of Fiduciary Duties)

90.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 89 of the complaint, as if set forth fully herein.

91.    Mr. Sankar owed fiduciary duties to NetYantra, including a duty not to usurp corporate opportunities, and the duty of loyalty.

92.    Vistula knowingly participated in Mr. Sankar's breach, knowing that Delaware law imposed fiduciary duties upon Mr. Sankar.

93.    In brazen violation of those fiduciary duties, Mr. Sankar (i) converted monies owed to NetYantra, and (ii) usurped from NetYantra the services contract with Vistula, and began performing those services ostensibly on his own behalf.

94.    By providing substantial assistance to Mr. Sankar's breaches, Defendants aided and abetted Mr. Sankar's breach of fiduciary duty.

95.    Vistula knew or should have known that Mr. Sankar's representations about NetYantra's corporate status were false, and that the making of such false claims was in dereliction of his duties.  Nonetheless, Vistula utilized those false representations as a basis for not paying the amounts that it owed NetYantra.

96.    NetYantra has been damaged by Defendants' conduct, in an amount to be established at trial.

**COUNT SEVEN (Against Mr. Sankar)**
**(Tortious Interference With Contract)**

97.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 96 of the complaint, as if set forth fully herein.

98.    NetYantra and Vistula had a contractual relationship embodied in the Distribution Agreement (kept extant by the Second Amendment to the Purchase Agreement).

99.    Defendant Mr. Sankar wrongfully inducted Vistula to breach that obligation.

100.    As a result of defendants' conduct, NetYantra has been damaged.

**COUNT EIGHT (Against Mr. And Mrs. Sankar)**
**(Breach of Contract/Conversion)**

101.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 100 of the complaint, as if set forth fully herein.

102.    In total, NetYantra wired $4,815,000.00 to the Sankars.

103.    The Sankars have repaid NetYantra only $2,160,000.00 of this amount.

104.    Accordingly, Mr. and Mrs. Sankar are obligated to transfer to NetYantra the balance ($2,655,000.00) wrongfully held by them.

105.    Mr. Sankar separately has retained the $339,840.00 owed NetYantra on the Services Agreement.

106.    Mr. and Mrs. Sankar have converted funds in which he had no personal interest, and which belonged to NetYantra.

107.    NetYantra has been injured by the Sankars' conversion of funds.

## COUNT NINE (Against Vistula and Mr. Sankar)
## (Quantum Meruit/Unjust Enrichment)

108.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 107 of the complaint, as if set forth fully herein.

109.    Plaintiffs have provided Defendant Vistula with services upon the expectation that they would be compensated for providing those services.

110.    In reliance upon that understanding, NetYantra performed the services requested.

111.    As a result of defendants' conduct, Defendant Vistula has been unjustly enriched by the provision of those services.

## COUNT TEN (Against Sankar)
## (Constructive Trust)

112.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 111 of the complaint, as if set forth fully herein.

113.    Defendant Sankar owes a fiduciary duty to Plaintiff.

114.    In breach of that duty, Defendant Sankar has accepted funds paid to him that were intended to be for the benefit of NetYantra.

115.    By law, these funds should be held to in a constructive trust for the benefit of NetYantra, and NetYantra seeks a declaration that it is the proper owner of these funds, or whatever end form traceable from these monies.

## COUNT ELEVEN (Against Vistula)
## (Breach of Registration Agreement)

116.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 116 of the Complaint.

117.    By virtue of the Registration Agreement between the parties, Vistula granted NetYantra the right to have its 14,000,000 shares registered with the S.E.C. by Vistula upon Vistula proposing to register "any of its stock under the Securities Act in connection with the public offering of such securities solely for cash."

118.    Vistula's May 2007 registration of those shares with the Securities and Exchange Commission triggered NetYantra's Registration Rights.

119.    NetYantra has made a demand for registration.

120.    Notwithstanding the clear rights provided in the Registration Agreement, Vistula has refused to register the securities.

121.    NetYantra has been injured by Vistula's breach, in an amount to be determined at trial.

122.    Further, NetYantra lacks an adequate remedy for the breach, and demands that Vistula fulfill its obligation to register the securities.

**COUNT TWELVE (against Mr. Bishop)**
**(Breach of Contract)**

123.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 122 of the Complaint.

124.    Following a series of discussions, NetYantra agreed to loan Mr. Bishop monies out of the sales proceeds.  Mr. Bishop confirmed this agreement in a June 29, 2006 email to NetYantra, acknowledging "Further to our conversations I confirm that I am borrowing $400,000 from you at NetYantra USA."

125.    The $400,000.00 was wired by NetYantra to Mr. Bishop on July 5, 2006.

126.    NetYantra made additional loans to Mr. Bishop.  In accordance with those loans, NetYantra wired to Mr. Bishop $50,000.00 on July 27, 2006; two $50,000.00 wires on August 4, 2006, and a final $250,000.00 wire sent to Mr. Bishop on August 18, 2006.

127.    In total, NetYantra loaned Mr. Bishop $800,000.

128.    These loans are due and payable upon demand by NetYantra.

129.    Mr. Bishop has not repaid said loans.

130.    NetYantra is entitled to the repayment of these loans, in the aggregate amount of $800,000.00.

## JURY DEMAND

131.    Plaintiffs request a jury trial on each of these allegations.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully pray for a judgment awarding them and the class the following relief:

1.    Awarding Plaintiffs sufficient amounts to compensate them for the damages caused by Vistula's and Mr. Sankar's conduct;

2.    Awarding Vinod and Sanjeev Menon sufficient amounts to compensate them for the damages caused by Vistula;

3.    Terminating Mr. Sankar's share holdings in NetYantra;

4.    Requiring Mr. Sankar to disgorge the payments for services and business opportunities that he usurped from NetYantra;

5.    Requiring Mr. and Mrs. Sankar to repay the $2,655,000.00 that they owe to NetYantra.

6.    Requiring Mr. Bishop to repay the $800,000 loan from NetYantra.

7.    Requiring Vistula to deliver to NetYantra the 14,000,000 shares owed it pursuant to the Purchase Agreement;

8.    Requiring Vistula to register the shares with the Securities and Exchange Commission;

9.    Awarding Plaintiffs punitive damages based upon Defendants' bad faith conduct, including the breaches of their fiduciary duties, and the breaches of the agreements;

10.    Awarding Plaintiffs their reasonable attorneys' fees and expenses;

11.    Taxing all costs of the Court and expenses of maintaining this suit;

12.    Awarding Plaintiffs prejudgment and post-judgment interest as may be allowed under law at the highest respective lawful rates; and

13.    Such other and further relief as the Court may deem just and appropriate.

Dated: March 7 , 2008

TRAIGER & HINCKLEY LLP

By_____
George R. Hinckley, Jr. (GH-7511)

George R. Hinckley, Jr.
Christoph C. Heisenberg (CH-8736)

880 Third Ave. 9th Floor
New York, NY 10022-4730
Tel.: (212) 759-4933
Fax: (212) 656-1531
Email: grh@hinckley.org